W. J. Small v. Commissioner.
Small v. Commissioner
Docket No. 3196-67.
United States Tax Court
T.C. Memo 1969-211; 1969 Tax Ct. Memo LEXIS 83; 28 T.C.M. (CCH) 1111; T.C.M. (RIA) 69211; October 13, 1969, Filed *83 Held: That the petitioner transferred real property to his children for less than an adequate and full consideration and that the excess of the value of the property over the value of the consideration received constituted a taxable gift. Section 2512(b) of the Internal Revenue Code of 1954. James Powers, 807 Security Bldg., 234 North Central Ave., Phoenix, Ariz., for the petitioner. Sheldon M. Sisson, for the respondent. ATKINS
Memorandum Findings of Fact and Opiniomn ATKINS, Judge: The respondent determined a deficiency in gift tax for the taxable year 1963 in the amount of $162,792. The issue presented for decision is whether the transfer by petitioner of real estate to his son and daughter in 1963 *84 constituted a gift and, if so, the amount thereof. Findings of Fact Some of the facts were stipulated and are incorporated herein by this reference. The legal residence of the petitioner at the time of the filing of the petition herein was 2214 North Central Avenue, Phoenix, Arizona. He filed a gift tax return for the taxable year 1963 with the district director of internal revenue, Phoenix, Arizona. Petitioner has been living in the Phoenix area since about 1957, having moved there from Kansas. During much of his life he had been engaged in general agricultural projects, including owning farms in Missouri, Kansas, Florida, and Arizona. Prior to leaving Kansas, petitioner's principal occupation had been the operation of the W. J. Small Co., as its president and chief executive officer. Such company was in existence from 1931 through 1951. Petitioner had operated it for five years as an individual and then incorporated it with a capitalization of $200,000, he and his wife being the majority stockholders. The W. J. Small Co. was engaged in the business of alfalfa dehydration, selling its product to commercial feed mills. It had installed the first such plant in the United States *85 in 1931, and by 1951 it had expanded to fifty-two plants with operations in seven states. In 1951, some of the assets of W. J. Small Co. were sold to Archer, Daniels, Midland for between $3,000,000 and $4,000,000 and the remaining assets of a value in excess of $2,000,000 were later sold to the petitioner. The corporation was then liquidated and its cash, its only asset, was distributed to its stockholders. Among the other stockholders of the W. J. Small Co. were petitioner's two children, Gwendolyn and Earl Small. After graduating from college in 1939, Gwendolyn had worked for the W. J. Small Co., being in charge of matters involving compensation to injured employees. In January 1940, she married Vaughn E. Wilmoth who had been working for the company for a number of 1112 years. After her marriage she moved to Brunswick, Missouri, where her husband managed one of the company's largest mills and she did general office and secretarial work at the mill. She continued working for the W. J. Small Co. until 1947, receiving a salary of $100 per month. Her husband continued working for the company until he became ill in 1950. Thereafter they derived their income from investing in *86 real estate. They owned farms in Kansas and Missouri which they rented and later sold at a profit. He handled their finances and she had little familiarity with them. Upon the liquidation of the W. J. Small Co. in 1951, Gwendolyn Wilmoth received in excess of $175,000 for the stock she held in the corporation. She had purchased some of this stock but had received the bulk of it as additional wages for her services. Of the money so received, she invested part in real estate with her husband, part in a new house and furniture, and loaned the balance of $150,000 at eight percent interest to her father in 1952. The loan was evidenced by demand notes and on his books petitioner carried a notes payable account with respect thereto. Gwendolyn received monthly interest payments on the loan and received occasional repayments of principal, all of which were shown in the notes payable account. By February 1, 1963, the balance of the principal owed her had been reduced to $99,000. Earl Small had also worked for the W. J. Small Co. after graduating from college for approximately seven years until 1940. He worked as a purchasing agent, as a travelling salesman, and finally as a shop foreman, *87 overseeing the manufacturing of machinery. His starting salary was $125 per month and by the time he left it had reached $175 per month. During the course of his employment by the company, he also received a substantial amount of stock as bonuses. In 1951, upon the liquidation of the W. J. Small Co., Earl Small received in excess of $200,000 for the stock that he owned. In 1940 Earl moved to Florida and after being in the military service during World War II, he entered into the wholesale greenhouse business which business, by 1963, grossed about $300,000. Before moving to Phoenix, petitioner had occasion to visit Arizona upon numerous occasions in connection with the Company's plants in Phoenix and Yuma. He also personally owned some large farms in the area. After moving to Arizona, petitioner continued to derive income from the operation of his agricultural holdings. In his income tax returns for the years 1960 to 1964 he also reported income from the rental and sale of real estate, including some homes which he owned near Yuma. The sales were made on a contract basis, with a down payment and the balance payable over a period of years, with interest. When the payments were not *88 made, petitioner repossessed the property, having retained legal title until the price had been paid in full. He did not transfer any funds to prospective purchasers so that they could make the payments to him. Petitioner also received substantial income from his investments in corporate stocks. Petitioner employed a business manager to handle his books and prepare his tax returns. On April 21, 1959, petitioner purchased, as his separate property, a parcel of land, known as the Borg Vineyard (hereinafter referred to as the Borg property) comprised of about eighty acres. It was located in Scottsdale, Arizona, fronting on Camelback Road, one-half mile west of the intersection with Scottsdale Road. At that time the property was being utilized as a grape vineyard. Included thereon were the pipelines, irrigation wells, and pumping equipment necessary to the operation of a vineyard. The purchase price was $557,145.75. Petitioner paid $380,000 in cash and assumed an existing mortgage for the balance. In accordance with an appraisal made by a firm hired by petitioner for that purpose, this price was allocated on petitioner's books between the land and depreciable assets, as follows: Land
$ 305,520.75
Vineyard
192,000.00
Fence
10,500.00
Pipeline
23,850.00
Irrigation, wells and equip- ment 25,275.00
Total
$557,145.75
*89 Petitioner operated the vineyard, retaining the services of the previous manager to supervise the growing and marketing of the grapes. The operation was unsuccessful, initially because of a depressed grape market and later also because of disease affecting the vines. In the last years of this operation petitioner incurred substantial losses and decided finally to destroy the vines which had become heavily diseased. By the fall of 1113 1962, the vineyard had been completely removed. [1]
In 1960 Maricopa County sought to acquire 18,368 square feet of the Borg property fronting on Camelback Road in order to widen that road. In an answer to the county's condemnation action, verified on October 27, 1960, petitioner stated that the *90 market value of this portion of the property, exclusive of improvements, was $12,000. As a result of the condemnation proceeding, petitioner was awarded $4,600 in 1962 and deeded the land to the county. Of this amount, $1,000 was allocated to cover the cost of re-laying irrigation pipelines and removing some vines. The balance was attributable to the value of the land alone. In 1962 Gwendolyn J. Wilmoth and her husband moved to Florida from Kansas and bought a new home there. They also invested in real estate in Florida. However, they were uncertain as to the soundness of their investments there because they were unfamiliar with the local market situation. In the late summer of 1962, petitioner visited his daughter in Florida. At this time Gwendolyn Wilmoth sought petitioner's advice about her investment situation. She also expressed her desire to invest the balance of the loan owed her by the petitioner in property with a potential for the future. Feeling that the real estate market was better in Arizona, she asked for and received petitioner's advice about buying land in Arizona. She had known about the Borg property from her previous visits to petitioner in Arizona. However, this *91 discussion did not center specifically on the possible purchase of the Borg property since it would have been too expensive for her to purchase alone. In the fall of 1962, Gwendolyn Wilmoth mentioned to her brother Earl the possibility of his buying an interest in the Borg property with her. He had also previously seen the Borg property. At this time Earl did not seriously consider the proposal since his greenhouse business required all his funds, and he would have to depend upon "outside money" to make payments on the Borg property. On November 1, 1962, the petitioner hired an appraiser, Albert Colby, asking him to value the property for the purpose of fixing a selling price. Petitioner had not previously known Colby, and he engaged Colby after petitioner's bank recommended him as a reliable appraiser. Colby never knew the identity of the prospective purchaser. Colby, in a written appraisal dated November 15, 1962, valued the land at $320,000, the irrigation system at $27,500, and fencing at $5,000, a total of $352,500. In the appraisal Colby stated that the property was zoned in the City of Scottsdale as R1-35 (meaning 35,000 square foot residential lots) and that he checked *92 with the Scottsdale Zoning Board and concluded that such zoning would not be changed in the foreseeable future as the city already had too much R-5 (apartment) and C-2 (commercial) vacant property. He further stated therein that after checking "asking prices" of comparable land just north of this property he found that the market had dropped considerably in the past six months, and that there had been no recent sales. About Thanksgiving of 1962, petitioner again visited his daughter Gwendolyn. Earl was also present and the petitioner, realizing that the Borg property would be too large an investment for his daughter and so advising her, stated that he would consider selling the property to Earl and Gwendolyn as a joint venture. Earl had doubts as to whether the property could be sold profitably for housing under the then zoning, but he hoped that in time the zoning would be changed. Thereafter there were further negotiations by telephone, as a result of which the petitioner by warranty deed dated February 1, 1963 conveyed to Earl Small and Gwendolyn Wilmoth each an undivided one-half interest in the Borg property, subject to an existing mortgage (the remaining unpaid balance then *93 being in the amount of $57,330) for a recited consideration of "TEN DOLLARS and other valuable considerations." Therein it was provided that if within a 10-year period either of the grantees should decide to sell his interest, petitioner should have the right to purchase such interest at the price offered by a third party, but that petitioner could not compel the sale. At the time of the transfer the property was no longer operating as a vineyard and 1114 all of the vines had been removed. At such time petitioner carried the land on his books at the amount of $304,010.14, the irrigation wells and equipment at a depreciated cost of $11,676.97, the pipeline at $9,738.94, and the fence at $1,755.80, or a total book value of $327,181.85. At the time of the transfer Earl Small paid the petitioner $35,000 in cash, which he had obtained from his wife, who in turn had received such amount as a gift from the petitioner's wife. He also executed in favor of the petitioner a non-interest-bearing demand note, dated February 1, 1963 in the amount of $101,042.69. Gwendolyn Wilmoth executed a similar note in favor of the petitioner in the amount of $46,042.69. Neither note was secured. At *94 this time Gwendolyn cancelled $90,000 of the balance of the loan due her from the petitioner. The transaction was recorded on the petitioner's books as a sale as follows: Selling price
$330,000.00
Less:
Borg First Mortgage Assumed by Earl and Gwen
$ 57,330.00
Less One Month's Taxes
153.32
Less Interest on Borg Note Due But Not Yet Payable
431.30 57,914.62
Balance Due W. J. Small
$272,085.38
Earl
$136,042.69
Less Cash Payment 35,000.00
Note Receivable
$101,042.69
Gwen
$136,042.69
Cancelled Note Due From W. J. Small 90,000.00
Note Receivable
$46,042.69
It was Earl's intention to pay the note for $101,042.69. While he did not have the cash to pay the note, he had sufficient property that he could liquidate to pay it. He owned ninety-five percent of the corporation operating the greenhouse business, which corporation had a total net worth in 1963 of about $500,000. It was Gwendolyn's intention to pay the note for $46,042.69. While she did not have sufficient liquid assets to pay the note, she did have income from various properties and had an insurance policy with a cash value of about $11,000. The investments which she and her husband *95 had in real estate, mostly in the Kansas City area, were worth at least $500,000, which could be sold if necessary to pay off the note. On his books the petitioner carried notes receivable accounts with respect to the above notes. On his books he also carried an open account for his son and daughter with respect to the property. He continued to receive some income from the property, consisting of $10 per month as rental for signs, and from July to December 1965 of additional amounts of $833 per month from Arizona Leisure Estates, and such amounts were entered as credits to the open account. The petitioner also continued to make all necessary payments with respect to the property, including payments on the mortgage, real estate taxes, and general repairs, and such amounts were entered as debits to the open account. As of December 31, 1963, petitioner had made net expenditures of $31,179.29. By June 29, 1966, these expenditures had reached a total of $55,235.09. On this date, one-half of this amount was transferred to the notes receivable account of each child, and new demand notes were executed to reflect this change. The notes receivable accounts show the following: 1115 Earl Small
Date
Payment
Balance
February 1, 1963
$101,042.69
March 4, 1964
$ 1,316.70
99,725.99
June 23, 1964
5,500.00
94,225.99
August 2, 1965
5,000.00
89,225.99
June 29, 1966 One-half of open account added
$27,617.54
116,843.53
July 1966
1,000.00
115,843.53
August 1966
1,000.00
114,843.53
September 1966
1,000.00
113,843.53
October 1966
2,000.00
111,843.53
December 1966
1,000.00
110,843.53
1967
January
1,000.00
109,843.53
February
1,000.00
108, 843.53
March
1,000.00
107,843.53
April
1,000.00
106,843.53
May
1,000.00
105,843.53
June
51,000.00
54,843.53September
42,000.00
12,843.53
Nove mber
12,843.53
0
Gwendolyn J. Wilmoth
Date February 1, 1963
$ 46,042.69
June 29, 1966
One-half of open account added
$27,617.55
73,660.24
August 12, 1966
500.00
73,160.24
September 2, 1966
22,500.00
50,660.24
October 5, 1966
1,200.00
49,460.24
November 2, 1966
800.00
48,660.24
December 7, 1966
650.00
48,010.24
January 1967
350.00
47,660.24
February
750.00
46,910.24
March 3, 1967
750.00
46,160.24
April 7, 1967
800.00
45,360.24
May 8, 1967
800.00
44,560.24
June 2, 1967
600.00
43,960.24
July 8, 1967
1,000.00
42,960.24
September 5, 1967
1,000.00
41,960.24
November 20, 1967
41,960.24
0
*96 1116 In 1967 the petitioner requested Earl to pay off the note, which he did from borrowed money, profits from his business, and from $42,000 representing proceeds from the sale of his residence. Of the money he borrowed, $2,000 was from a firm in St. Louis in which petitioner had a substantial interest. On a gift tax return for 1964, petitioner reported gifts to Earl in the form of cash in the amount of $4,300 and in the form of life insurance premiums in the amount of $1,488.77. In a gift tax return for 1965 petitioner reported gifts to Earl in the form of cash in the amount of $6,000 and in the form of life insurance premiums in the amount of $1,861.27. In 1967 Earl Small also received gifts of $500 from petitioner. On November 13, 1964, the petitioner, acting as agent for Gwendolyn and Earl, filed an application for rezoning of the north 40 acres of the Borg property from the classification of R1-35 to R-4R, a resort classification. [2] At the time of the publication of the notice of the application there was some local opposition, which, however, was resolved before the meeting of the Planning Commission of the City of Scottsdale. The commission unanimously recommended *97 the application and approved the site plan, and the City Council of Scottsdale approved the application on January 19, 1965. Frank H. Burch, an attorney who represented Arizona Leisure Estates, handled the rezoning application. In 1966 Gwendolyn and Earl leased the north 40 acres of the property to Arizona Leisure Estates for development in accordance with its new R4-R rezoning, and construction began thereon in 1968. The Phoenix-Scottsdale area, particularly near Camelback Mountain, is a famous winter resort area, containing resort facilities and fine *98 homes. With respect to flat land in the area orange groves were regarded as most desirable for residential lots, with desert areas next in desirability, and farmland last. At February 1, 1963, the Borg property consisted of flat vacant farmland, without trees or desert growth, within the City of Scottsdale, and was zoned R1-35, which restricted its use to single family residences on 35,000 square foot lots. It was bordered on the south by Camelback Road. Approximately one-half mile to the east was the intersection of Camelback and Scottsdale Roads, which was the commercial and financial center of Scottsdale. At such intersection there was located Fashion Square Shopping Center, which contained such stores as Goldwater's, Rosenzweig's, and Bostrom's. Separating the Borg property from Fashion Square was a largely undeveloped 40-acre tract of land, the southeast 10 acres of which had been rezoned to C-3 (commercial) and the remainder to R-5 (apartments). Opposite Fashion Square was a large hotel-motel known as the Safari Hotel, and one-fourth mile farther north was another known as the Executive House. One-fourth of a mile to the south of Fashion Square is located the Fifth Avenue *99 area, which contains some of Scottsdale's most exclusive shops. To the west of the Borg property was Camelback Mountain which had been the generating source of value in this area for 75 years. Immediately to the west of the property, separated by a strip of fine homes, was the Valley Country Club, which served as a barrier to further commercial development in that direction. To the south and west was the Arcadia District, a citrus grove area containing high-priced homes in the $50,000 to $100,000 class. Immediately to the north of the property was Casa Blanca which contained a winter resort and some high-priced residences located on flat land. Such residential development had not proved to be a great success. After experiencing a rapid growth in the 1950's, residential construction in Maricopa County, Arizona, reached its peak in 1959. In the early 1960's single family residential construction underwent a marked decline, while construction of multiple family units was increasing. This is reflected in the figures for new housing authorized in Maricopa County, which includes both Phoenix and Scottsdale, as follows: 1117 Year
No. of singlefamily units
Valuation
No. of multiplefamily units
Valuation
1960
13,727
$129,418,000
2,593
$13,716,000
1961
11,624
109,547,000
3,444
22,293,000
1962
7,572
73,897,000
6,609
44,613,000
1963
5,682
56,623,000
9,227
52,708,000
*100 The decline around Camelback Mountain and Scottsdale and Camelback Roads occurred later in the early 1960's than elsewhere in the county. In his gift tax return for the year 1963, the petitioner reported having made one gift of $3,000 in cash to Lucille Small. He did not therein report any gift with respect daughter Gwendolyn and his son Earl. In to the transfer of the Borg property to his his income tax return for that year he reported such transaction as a sale resulting in an ordinary gain of $2,403.43. In the spring of 1966 the respondent commenced an examination of the gift tax liability of the petitioner for the year 1963. In the notice of deficiency the respondent determined that the Borg property at the time of transfer thereof by petitioner to his son Earl and his daughter Gwendolyn had a value of $700,000, that the transfer was made without a full and adequate consideration in money or money's worth, and that therefore the petitioner made a gift of $700,000 in 1963. The fair market value of the Borg property on February 1, 1963, was $480,000. The value of the consideration received by the petitioner from Gwendolyn and Earl for the transfers of the Borg property to *101 them was $272,085.38. Opinion The respondent contends that the Borg property was transferred by the petitioner to his children, Gwendolyn and Earl, without any consideration, and that hence under section 2512 of the Internal Revenue Code of 1954[3] it is to be considered that he made a gift to the children in the amount of the fair market value of such property at the date of the transfer. He further contends that the amount of $330,000 at which the petitioner purportedly sold the property to his children did not, in fact, represent the fair market value of the property at that time; rather, he determined, and contends, that the property had a fair market value of $700,000 on that date. *102 The petitioner, on the other hand, contends that the transaction constituted a bona fide sale to the children for a full and adequate consideration, within the contemplations of the statute. He contends that this is not a case where a father deliberately made a bargain sale to his children. Rather, he contends that he made, in good faith, a reasonable effort to fix a fair price for the property, relying upon the opinion of an appraiser, and that under such circumstances the statute does not require that the consideration be the highest possible consideration which could have been obtained for the property, or that such consideration precisely match a hypothetical valuation of the property which, at best, must result from an exercise of judgment. He contends, in the alternative, that if the Court should find it necessary to determine the fair market value of the property, such fair market value did not exceed $380,000. We view the above contentions made by the petitioner as meaning that he considers that there was a transfer made in the ordinary course of business within the meaning of the Gift Tax Regulations, and that therefore it should be considered that the transfer was made *103 for a full and adequate consideration in money or money's worth. We 1118 cannot agree with this view. The fact that the petitioner accepted unsecured non-interest-bearing notes from his children indicates to us that he was not dealing with his children as he would with a person in the ordinary course of business. Indeed, the evidence indicates that in the dealings which he carried on in the course of his business transactions he did charge interest and required security provisions which he strictly enforced. In addition, the fact that after the transaction the petitioner continued to make certain payments with respect to the property on behalf of his children is inconsistent with a view that his dealings with the children were in the ordinary course of business. Under the circumstances, it is proper to consider whether the value of the property transferred exceeded the value of the consideration received. See Commissioner v. Wemyss, 324 U.S. 303. As stated above, the petitioner contends that the fair market value of the property at the date of transfer did not exceed $380,000. At the trial he called as witnesses two appraisers, Albert Colby and John Edward Haynes. *104 The respondent also called as a witness an appraiser, Frank Kelly. Each appraiser testified as to sales of other properties. Kelly referred to numerous such sales. However, it is apparent from the testimony that none of such other properties was directly comparable to the Borg property either because of the type of terrain, distance from the center of Scottsdale, size of the tract involved, the varying potentials for use, differences in zoning, etc., and that some were more valuable and some less valuable than the Borg property. The Borg property, at February 1, 1963, consisted of vacant farmland, but was zoned R1-35, which permitted single family residences on 35,000 square foot lots. However, we are satisfied from the testimony that, considering the location of the land, it also had value for potential development for resort, apartment, or commercial uses. Colby had, at petitioner's request, appraised the land in November 1962. At that time he had valued the land at $320,000. He testified that, in his opinion, the property had the same value on February 1, 1963. While he testified that the property was more suitable for development as apartments under R-5 zoning, he based his *105 valuation upon the property as it was then zoned since he was of the opinion that it would not be possible in the foreseeable future to have the property rezoned for that purpose or for C-2 (commercial). He had, at the time of his original appraisal, consulted the Scottsdale Zoning Board and had been advised that the property would not be rezoned for apartment and commercial use because there was already enough vacant property zoned for such purposes. He conceded, however, that in the past he had observed changes in zoning policy on various occasions. Haynes testified that in 1966 he was engaged by the petitioner to appraise the Borg property as of February 1, 1963, and that he valued it at $5,000 per acre. However, it appears that Haynes in his valuation gave little or no weight to any potential use other than for residential purposes. Another witness called by petitioner, Frank Haze Burch, an attorney who had had much experience with the zoning practices of Scottsdale, testified that in 1963 there was practically no possibility of having the Borg property rezoned, and that no value should be ascribed to any such possibility. Burch did later, in January 1965, obtain for the petitioner *106 a reclassification of the Borg property to R-4R (restricted resort zoning). Kelly testified that because of its location the Borg property had the potential for higher density development (commercial, resort, and apartments), and that a prospective purchaser would consider such a potential and would accordingly pay more for the land. He further stated that the higher density rezoning of property immediately to the east of the Borg property would, in the view of a prospective purchaser, enhance the chance of rezoning the property in question and would enhance its value. He testified to a number of sales of property, including sales of tracts of land in June 1962, and January and February 1963, at the respective prices per acre of $8,750, $7,535, and $6,400, each of which tracts he considered less valuable than the Borg property largely because of the greater potential of the Borg property for higher density and commercial development. He expressed the opinion that the Borg property at February 1, 1963, had a value for residential use under its then zoning of about $7,500 per acre, but that considering its potential uses it had a value at that time of $9,000 per acre, or a total of *107 $700,000. It will thus be seen that the witnesses have widely divergent views as to the fair market 1119 value of the property at February 1, 1963. In this situation the problem of fixing a value is extremely difficult. We have, however, exercised our best judgment and have concluded that as of that date the Borg property had a fair market value of $480,000, and have so found as a fact. In reaching this conclusion we have given careful consideration to the opinions of the witnesses and to the sales of property upon which they based their opinions. We have also taken into consideration the testimony of the various witnesses with respect to the potential use of the property as well as to their testimony as to the then probability of rezoning the property. We have also taken into consideration the fact that at that time the construction of single family residential units was undergoing a decline, although the construction of multiple family units was increasing. The respondent takes the position that the petitioner made a gift to his children in the amount of the full fair market value of the property at February 1, 1963. He thus takes the position that the petitioner received *108 no consideration for the transfer of the property. On brief the respondent contends that the unsecured non-interest-bearing demand notes given by Gwendolyn and Earl on February 1, 1963, in the respective amounts of $46,042.69 and $101,042.69 cannot be considered as constituting any consideration whatever. We find ourselves in disagreement with this view. From the evidence presented, we are satisfied that the notes constituted bona fide obligations. Each child testified that it was his intention to pay the note and, although neither then had cash or liquid assets available to pay his note, each had property of a value far in excess of the face amount of his note. Furthermore, while the petitioner did not testify directly as to his intention to enforce collection of the notes, we think the record establishes that such was his intention. In this connection, we note that in negotiations with the children he was unwilling to sell the property to his daughter alone, realizing that it would be too large an investment for her, but was willing to sell if his son Earl would join in the purchase with his sister. The notes were paid in full by November 1967, albeit, as pointed out by the respondent, *109 no significant payments were made until after the respondent had commenced the gift tax liability examination in 1966. There is no suggestion made by the respondent on brief that the payments made by Gwendolyn or the payments made by Earl in 1966 and 1967 were made from money advanced by the petitioner. While we are not advised as to the source of the funds used by Gwendolyn to make her payments, we do know that Earl, in making his payments in 1967 totaling approximately $110,000, used profits from his greenhouse business, money which he borrowed, and $42,000 representing proceeds from the sale of his home. The respondent states on brief that payments on the note made by Earl in 1964 and 1965, in the respective amounts of $6,816.70 and $5,000, "appear" to have come from gifts made by petitioner to Earl. The evidence shows that in 1964 and 1965 the petitioner made cash gifts to Earl, which were reported in gift tax returns, in the respective amounts of $4,300 and $6,000. The record does not show whether these gifts were used by Earl to make payments to his father on his note, but if they were we do not think such fact would in itself indicate that when the note was given Earl lacked *110 an intention to repay it or that the petitioner lacked an intention to enforce payment. Nor in our opinion does the fact that the petitioner, after the transfer of property, continued to make mortgage and other payments on the property on behalf of the children, indicate that there was no bona fide indebtedness created by the original notes. The petitioner kept detailed records of the amounts which he so advanced, debiting the open account which he carried in the name of his two children. The amounts so advanced were included in demand notes which were paid. As part of the transaction, Gwendolyn cancelled $90,000 of the balance of a note due her from the petitioner. The respondent contends that such cancellation did not represent consideration. He, in effect, questions whether there was in fact a debt due from the petitioner to Gwendolyn. However, we are satisfied from the evidence that Gwendolyn had, in 1951, owned stock of the W. J. Small Co., and that upon the liquidation of that company she received $175,000, of which she shortly thereafter loaned $150,000 to her father. The evidence indicates that she purchased some of the stock and received some of the stock as compensation *111 for services rendered. Even if some portion of her interest in the corporation had been at some time received by her as a gift from her father, we are satisfied that it was not related to the instant transaction which occurred in 1963. We accordingly hold that her cancellation of $90,000 of the debt owing 1120 to her by the petitioner constituted valid consideration for the transfer of the Borg property. The respondent also contends that the $35,000 cash which Earl paid petitioner at the time of the transfer of the Borg property did not constitute consideration paid by Earl, inasmuch as such cash was obtained by Earl from his wife who in turn had obtained it from his mother, the petitioner's wife. On brief the respondent, although apparently not denying that the $35,000 actually came from petitioner's wife, contends that in effect this amounted to the furnishing of the $35,000 by the petitioner himself. However, Earl testified that his mother made a gift of $35,000 to his wife, that the money belonged to his wife, and that he "borrowed" it from his wife in order to make the down payment. There is no intimation in the record that the petitioner furnished the money to his wife *112 to make the gift to Earl's wife. Upon this record we think it must be concluded that the $35,000 did constitute a gift by petitioner's wife to Earl's wife which itself would be subject to the gift tax provisions, and consequently we see no reason for concluding that the $35,000 paid by Earl should not be considered as valid consideration paid to the petitioner. Accordingly, we have concluded and have found as a fact that upon the transfer of the Borg property to Earl and Gwendolyn petitioner received from them consideration in the amount of $272,085.38. Since the property in question at the time of transfer was encumbered by a mortgage of $57,330, the equity which the petitioner transferred amounted to $422,670, for which the children gave consideration of $272,085.38. In accordance with the provisions of section 2512(b) of the Code, the amount of $150,584.62, representing the excess of the value of the property over the value of the consideration received, is deemed a gift by the petitioner to his children. Decision will be entered under Rule 50. Footnotes
1. On his 1962 income tax return, petitioner claimed an abandonment loss for the destruction of the vineyard. A dispute arose with the Internal Revenue Service as to the proper allocation of basis. In 1965 an agreement was reached, reallocating the basis as of April 21, 1959, as follows: ↩
Land
$ 371,385.38
Vineyard
141,740.37
Fence
7,767.50
Pipeline
17,620.00
Irrigation, wells and equip- ment 18,632.50
Total
$557,145.75
2. Such classification allowed resorts, hotels, motels, and commercial uses incidental thereto, such as restaurants, barber shops and small retail shops. The minimum size for development was 7 1/2 acres and the minimum area per dwelling unit was 4,250 square feet. Such classification required special treatment where there were adjacent residential uses and required site plan approval by the Planning Commission and the City Council. This classification was created under a revision of zoning regulations adopted November 1, 1964. However, the prior regulations provided for the same type of zoning under a multiple classification.↩
3. SEC. 2512. VALUATION OF GIFTS. (a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. (b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year. Section 25.2512-8 of the Gift Tax Regulations provides in part as follows: Transfers for insufficient consideration. Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. * * *↩